# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JERRY MARTENEY, Derivatively on Behalf of Nominal Defendant CHINA-BIOTICS, INC., 405 Sycamore Drive Louisville, OH 44641 | Case No. |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| SONG JINAN, CHIN JI WEI, DU WEN MIN, and SIMON YICK, 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and | |
| CHINA-BIOTICS, INC., 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 | |
| Nominal Defendant. | |

Plaintiff Jerry Marteney ("Plaintiff"), by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant China-Biotics, Inc. ("China-Biotics" or the "Company") against the members of its

Board of Directors (the "Board"), referred to collectively as the "Individual Defendants" (as described more fully herein), seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and other violations of law.

2.     China-Biotics and its subsidiaries purportedly engage in the research, development, production, marketing and distribution of probiotics products in China. The Company markets and sells its products under the "Shining" brand name. Throughout the relevant period the Company touted that its products were sold through numerous retail branded outlets and stores.  The Company's stock is listed on the NASDAQ under ticker symbol "CHBT."

3.     China-Biotics is a U.S.-listed Chinese "reverse takeover" ("RTO") company, a company that has obtained a U.S. stock market listing through a "back-door" maneuver known as a RTO, where an active Chinese business merges into a dormant American shell corporation that was registered for the purpose of public trading.

4.     The financial filings of China-Biotics submitted to China's State Administration for Industry and Commerce ("SAIC") often have not been consistent with filings submitted to the U.S. Securities and Exchange Commission ("SEC").  Substantial disparities between the two sets of filings demonstrate that the Individual Defendants issued materially false and misleading statements and omitted material facts that rendered their affirmative statements misleading as they related to the Company's financial performance, business prospects, and financial condition.

5.     China-Biotics' 2007-2010 SAIC reports and financial statements indicate that the Company is far smaller than its SEC filings indicate.  Indeed, China-Biotics' SAIC filings show a company generating less than one-tenth of its SEC-reported revenue.  For example, in the Company's 2007 financial statements filed with the SAIC, the Individual Defendants reported $0.4 million in revenue and a net loss of $1.1 million, yet in the Company's 2007 financial statements filed with the SEC they reported $30.6 million in revenue and $10.9 in net income. Similarly, for 2008 the Individual Defendants reported to the SAIC $0.5 million in revenue and a

net loss of $1.2 million, yet reported to the SEC $42.3 million in revenue and net income of $17.5 million.

6.     In breach of their fiduciary duties to the Company, the entire Board knowingly engaged in improper financial reporting and accounting practices, and disseminated false and misleading financial statements in violation of SEC regulations and Generally Accepted Accounting Principles ("GAAP").  Each of the Individual Defendants knowingly disseminated inaccurate and misleading financial information regarding the Company, and these misrepresentations of the Company's financials, via submissions to the SEC and the SAIC, constitute a breach of their fiduciary duties to the Company.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.     Venue is proper because substantial portions of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants directed numerous activities and conducted business here, which had an effect in this district, including, but not limited to, filing numerous documents with the SEC and disseminating these filings to shareholders.

## PARTIES

9.     Plaintiff is a shareholder of nominal defendant China-Biotics, was a shareholder of China-Biotics at the time of the wrongdoing alleged herein, and has been a shareholder of China-Biotics continuously since that time.  Plaintiff is a citizen of the State of Ohio.

10.     Nominal defendant China-Biotics is a Delaware corporation with its principal executive offices located in Pudong, Shanghai, People's Republic of China.  China-Biotics and

its subsidiaries purportedly engage in the research, development, production, marketing and distribution of probiotics products in China. The Company markets and sells its products under the "Shining" brand name. Throughout the relevant period the Company touted that its products were sold through numerous retail branded outlets and stores.

11.     Defendant Song Jinan ("Song") has been Chairman of the Board, Chief Executive Officer ("CEO"), President, Treasurer, and Secretary of the Company since March 2006. Defendant Song was one of the founders of Shanghai Shining Biotechnology Co. Ltd. ("Shining") in 1999, and has been the principal executive officer of Shining since its inception. Upon information and belief, Defendant Song is a citizen of China.

12.     Defendant Chin Ji Wei ("Chin") has been a Director of the Company since January 2007. Defendant Chin is a member of the Company's Audit Committee. Upon information and belief, Defendant Chin is a citizen of China.

13.     Defendant Du Wen Min ("Du") has been a Director of the Company since January 2007. Defendant Du is a member of the Company's Audit Committee. Upon information and belief, Defendant Du is a citizen of China.

14.     Defendant Simon Yick ("Yick") has been a Director of the Company since January 2007. Defendant Yick is a member of the the Company's Audit Committee and is the committee's designated financial expert.  Upon information and belief, Defendant Yick is a citizen of Hong Kong.

15.     Collectively, Defendants Song, Chin, Du and Yick are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual

Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

17.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements and financial statements issued and/or submitted by the Company. Because of their advisory, executive, managerial, and directorial positions with China-Biotics, each of the Individual Defendants had knowledge of material non-public information regarding the Company, including, but not limited to, the information which forms the basis of this complaint; specifically, that inaccurate and misleading financial statements were being submitted by the Company.

18.     The Individual Defendants as officers and directors of a publicly held company, had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

19.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company, and by virtue of such duties, the Individual Defendants were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all

applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.  exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP;

d.  when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

e.  refrain from acting upon material inside corporate information to benefit themselves.

20.  The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and for ensuring that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

a.  make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.  transactions are executed in accordance with management's general or specific authorization; and

ii.  transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

21.  China-Biotics' Audit Committee Charter provides that the Audit Committee (comprised of defendants Chin, Du, and Yick) has responsibility for, among other things:

a.  appointing, determining the funding for, and overseeing the independent registered public accounting firm;

b.  assisting the Board in monitoring the integrity of the Company's financial statements and other SEC filings;

     c.     discussing with the management and our independent registered public accounting firm significant financial reporting issues and judgments and any major issues as to the adequacy of our internal controls;

     d.     reviewing the annual and quarterly financial statements prior to their filing with the SEC and prior to the release of our results of operations;

     e.     reviewing the independence, performance and qualifications of the Company's independent registered public accounting firm and presenting its conclusions to the Board and approving, subject to permitted exceptions, any non-audit services proposed to be performed by the independent registered public accounting firm; and

     f.     assisting the Board in its oversight responsibilities regarding the performance of the Company's internal audit function.

22.     The Company's Code of Conduct and Ethics ("Code") states:

This Code is intended to deter wrongdoing and to promote the following:

     a.     honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

     b.     full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with, or submits to, the [SEC] and in other public communications made by the Company;

     c.     compliance with applicable governmental rules and regulations and the rules of any exchange or quotation system on which the Company's securities are listed or quoted;

     d.     prompt internal reporting of violations of this Code to the appropriate person or persons identified in this Code; and

     e.     accountability for adherence to this Code.

23.     The Code further states, with regard to corporate disclosures:

All directors, officers and employees should support the Company's goal to have full, fair, accurate and timely disclosure in the reports required to be filed by the Company with the SEC. Each director, officer and employee should promptly bring to the attention of the CEO, the CFO or the Company's Audit Committee, as appropriate, any of the following:

a.   any material information to which such individual may become aware that affects the disclosures made by the Company in its public filings or would otherwise assist the CEO, the CFO and the Audit Committee in fulfilling their responsibilities with respect to such public filings;

b.   any information the individual may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls;

c.   any information the individual may have concerning any violation of this Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls; and

d.   any information the individual may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of any violation of this Code.

24.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of 2007-2010 financial statements submitted to the SEC and SAIC by the Company.

## SUBSTANTIVE ALLEGATIONS

### Background

25.   In recent years, a class of Chinese companies has emerged on the international capital markets. These companies obtain U.S. listings through a "back-door" maneuver known as a RTO, wherein they are able to avoid initial public offerings, which are more public, slower and more onerous.  Typically, a Chinese business is acquired by a U.S. dormant shell company that is worthless except for its public listing.  The American board then resigns, and the Chinese board takes over.  The company changes its name and issues new stock to hedge funds and other

investors, raising millions of dollars in fresh capital. China-Biotics is one of these U.S.-listed Chinese companies that has obtained a U.S. stock market listing through this RTO "back-door" maneuver.

26.     These Chinese RTO companies often fall between the cracks of market regulation, as the SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S. Additionally, many RTO companies admit in prospectuses that they haven't gotten required approvals under China's financial regulations.

27.     The Public Company Accounting Oversight Board ("PCAOB"), established under the Sarbanes-Oxley Act to police auditors, recently warned against lax auditing of U.S.-listed Chinese businesses. The PCAOB plans to ask Congress to lift restrictions on the disclosure of its disciplinary proceedings against accountants. China is one of several nations that won't let the PCAOB inspect the local auditors used by U.S.-listed companies.

28.     The history of the Company's reverse merger is discussed in the Company's annual report for the fiscal year ended March 31, 2010, filed with the SEC on Form 10-K on July 14, 2010 (the "2010 10-K"):

> We were incorporated under the name Otish Resources, Inc. in Delaware in February 2003. Prior to March 2006 we were a mineral exploration stage company specializing in acquiring and consolidating mineral properties with potential for commercial ore bodies. Although we conducted some preliminary exploration work with respect to our mineral properties, we never achieved full operations with respect to our mineral properties. We had never generated any revenue from our mineral exploration operations.
>
> On March 22, 2006, we entered into and completed a securities exchange agreement with Sinosmart Group Inc., or SGI, and the SGI shareholders pursuant to which the SGI shareholders transferred all of the equity securities of SGI to us in exchange for the issuance of shares of our common stock. We refer to this transaction in this document as the share exchange. At the closing of the share exchange, we issued to the SGI shareholders an aggregate of 15,980,000 shares of our common stock in exchange for their shares of SGI, and SGI became our wholly-owned subsidiary. SGI owns all of the equity securities of Shanghai Shining

Biotechnology Co. Ltd., or Shining. As a result of the share exchange, we are no longer a mineral exploration stage company, and SGI's business operations become our primary operations. We are currently engaged in the research, development, production, marketing and distribution of probiotics products. These products contain live microbial food supplements that beneficially affect the host by improving its intestinal microbial balance.

SGI was incorporated in the British Virgin Islands on February 13, 2004. On December 9, 2005, SGI incorporated a wholly-owned subsidiary, Growing State Limited, in accordance with the laws of the British Virgin Islands. On September 22, 2006, Growing State Limited established a wholly-foreign owned enterprise, Growing Bioengineering (Shanghai) Company Limited, in China.

### Significant Discrepancies Between the Company's SAIC and SEC Filings

29.     Chinese RTO companies are required to submit financial statements to the SAIC and such submission requirements are analogous to the required financial information submitted to the SEC. The SAIC government website states that the SAIC functions in maintaining market order and protecting legitimate interests of businesses and consumers by carrying out regulations in the fields of enterprise registration, competition, consumer protection, trademark protection and combating economic illegalities.

30.     The financial statements of China-Biotics submitted to the SAIC often have been wildly inconsistent with filings submitted to the SEC, particularly with regard to the Company's revenues and net income.

31.     The following figures are examples of the substantial and inexplicable discrepancies in the figures reported in the Company's financial filings submitted to the SAIC and the SEC:

|  | **2007 Reported Financial Statements** | |
|  | **SAIC** | **SEC** |
| Cash | $0 | $27,000,000 |
| Accounts Receivable | $900,000 | $14,300,000 |
| Revenues | $400,000 | $30,600,000 |
| Net Income/(Loss) | ($1,100,000) | $10,900,000 |

|  | **2008 Reported Financial Statements** | |
|  | **SAIC** | **SEC** |

| | | |
|---|---|---|
| Cash | $100,000 | $64,300,000 |
| Accounts Receivable | $1,000,000 | $13,200,000 |
| Revenues | $500,000 | $42,300,000 |
| Gross Profits | $200,000 | $30,000,000 |
| Net Income/(Loss) | ($1,200,000) | $17,500,000 |

32.     The foregoing discrepancies cannot be attributed to differences between U.S. and Chinese GAAP, nor to any other legitimate accounting matter.  The only explanation is that one or both sets of financial statements were materially inaccurate and misleading.

### Misrepresentations Regarding the Company's "Stores" and "Retail Outlets"

33.     In addition to their foregoing misrepresentations regarding the Company's financial statements, defendants Song, Chin, Du, and Yick also consistently and repeatedly misrepresented the size, scope, and growth of its purported network of "stores" and "retail outlets" in China.

34.     According to the Company's annual report for the fiscal year ended March 31, 2007, filed with the SEC on Form 10-KSB on June 21, 2007 (the "2007 10-K"), "[a]t the end of March 2007, [the Company] had opened a total of nine stores in Shanghai."

35.     According to the Company's annual report for the fiscal year ended March 31, 2008, filed with the SEC on Form 10-KSB on July 10, 2008 (the "2008 10-K"), "[a]s at March 31, 2008, [the Company] had a total of 60 Shining retail stores.  46 of these stores are located in Shanghai and the rest are located in 5 cities in China including Changchun and Jilin.

36.     According to the Company's annual report for the fiscal year ended March 31, 2009, filed with the SEC on Form 10-K on July 14, 2009 (the "2009 10-K"), "[a]s at March 31, 2009, [the Company has] opened 106 outlets in Shanghai and 12 other cities in China."

37.     According to the Company's annual report for the fiscal year ended March 31, 2010, filed with the SEC on Form 10-K on June 14, 2010 (the "2010 10-K"), "[a]s at March 31, 2010, [the Company has] opened 111 outlets in Shanghai and 12 other cities in China."

38. On September 14, 2010, Citron Research issued a report revealing that the Company's purportedly fast-growing network of "stores" and "retail outlets" was largely non-existent, or at a minimum grossly exaggerated:

> Two weeks ago in our first article, Citron questioned the "network of stores" that are claimed by [China-Biotics] – the same stores referenced in years' worth of SEC filings, but are also discussed in every analyst report. More importantly, the stores that investors relied upon when they forked over $75 million for shares.

> * * *

> Once we questioned the stores' existence, [China-Biotics] immediately put on their website a list of the "branded stores" as they state in their SEC filings. Within hours Citron was able to determine that these were not their stores, 95% of them were just supermarkets and retail outlets. We took it a step further and hired two private investigators to take pictures and prove what we knew. Once we brought that to the attention of the investing public, the company changed their website again to eliminate the word "stores"… a play right out of the scamsters' handbook. They also eliminated the line "The Company's most recognizable customers include Bright Dairy, and Relax Xinqiao." Why? Now it just says "the following is a list of sample locations where you can find our product."

> * * *

> 43 of the locations published on the company's website, until recently claimed to be "branded outlet" locations, have now been surveyed, with photos:

> Company stores (like those pictured on the company's website): 2
> Supermarkets or drugstores carrying one or two products on a small shelf space: 16
> A store offering no CHBT product whatsoever on its shelves: 17
> No retail at that address, or nothing at all: 8
> Store-within-store or kiosk (Yes our visitors politely asked): 0

39. According to *www.therealchbt.com*, a website created to address the issue of whether China-Biotics has misled investors, the Company misstated its store base numbers and locations as follows:

> Citron Research first alleged fraud at China-Biotics in this report. The company responded by providing a list of the locations for its stores,

shown here. We hired private investigators to visit a majority of these locations, and have published our findings on this website.

The company's list of locations provides 80 locations. 1 of these locations is a repetition of a previous location, leaving 79 independent locations. We visited 43 of these locations. We found a China-Biotics store at 2 of these 43 locations. The remainder of the addresses were supermarkets, hotels, office buildings and empty lots. There were no China-Biotics stores or kiosks inside the larger stores. There were China-Biotics products located on shelves at 18 of the 43 locations we visited.

…

The only standalone stores that we found are essentially the same ones that showed up when we searched for the chinese characters of the company's stores ("益生有益" or click here if your browser doesn't support Chinese fonts) in http://map.baidu.com, http://shanghai.aibang.com, and http://www.mapbar.com.

The conclusion, in our opinion, is simple. The company claimed to have 100+ stores. Based on our simple visits to a majority of the addresses provided by the company, we believe that's a blatant lie.

…

**<u>Did the Company ever specifically claim it had stores?</u>**

Yes, the company has historically claimed that it operates 100+ stores.

Here is disclosure from their 2010 10K. The company says:

"We intend to expand the sale of our retail products to the other metropolitan cities in China through a combination of traditional distribution channels and dedicated Shining outlets. We have a total of 111 outlets as of March 31, 2010."

The company makes a specific distinction between "traditional distribution channels" and "dedicated Shining outlets". We don't think shelf space at a Tesco supermarket is what investors typically have in mind when they read "dedicated Shining outlets". Elsewhere, the company refers to its outlets as stores. See this press release from third quarter 2010, where the company announces the opening of "four new retail stores". Or here, where they claim that in 2008, they "opened 51 new Shining-branded retail outlets, bringing the total number of stores to 60".

Even in the press release announcing their investor day, the company promises visitors a "tour visiting China-Biotics' retail stores". A more accurate statement would be a "tour visiting China-Biotics' shelf space".

…

Here is a breakdown of the company's alleged sales based on distributors versus "retail outlets" for 2008, 2009 and 2010, according to its SEC disclosure.

| Sales Breakdown: Distributors vs "Retail Outlets" | | | |
|---|---|---|---|
| | 2008 | 2009 | 2010 |
| Distributors | 90.0% | 65.0% | 61.5% |
| "Retail Outlets" | 9.0% | 26.7% | 11.7% |
| **Total Retail** | **99.0%** | **91.7%** | **73.2%** |
| Total Bulk Additives | 1.0% | 8.3% | 26.8% |
| **Total Sales** | **100.0%** | **100.0%** | **100.0%** |

The company generated more than a quarter of its sales from its retail outlets in 2009.

**Further Fabrications in SEC Filings**

Our store investigation demonstrates that the company likely only owns 6-7 standalone stores. That indicates that the company is also lying about other aspects of their SEC filings.

First, the company is lying about its employees, in our opinion. Here is disclosure from the 10K, where the company lists 232 full-time employees at its retail outlets.

Our private investigators did not see any full-time China-Biotics employees manning the Shining Golden Essence shelves at Carrefour. It certainly doesn't take 232 employees to operate 6-7 small retail outlets.

Second, the company has, as we see it, lied in its Management's Discussion & Analysis in prior SEC filings. See the following disclosure in its 2008 10K, which I've also attached here:

"Selling expenses were $6,869,109 or 16.2% of net sales for the fiscal year ended March 31, 2008 compared with $4,502,687 or 14.7% of net sales for the fiscal year ended March 31, 2007. The operating costs of the retail stores are included as selling expenses. This increase in selling expenses was primarily caused by the roll out of retail stores. As of March 31, 2008, we had a total of 60 retail stores in operation (as of March 31, 2007, we had 9 retail stores)."

As discussed, the company doesn't appear to have anywhere close to 60 retail stores.

Third, the company appears to be lying about its lease expense. The company reported $3.4m and $3.9m of lease expense in fiscal years 2009 and 2010. After excluding the $74k of lease expense for its Pudong facility (the company discloses that it has no recurring lease expense for its Qingpu facility), that leaves $3.3m and $3.8m of lease expense for its store base.

$3.8m of lease expense for 6-7 stores would imply annual rent of $550k per store. Small stores such as those shown here and here are more likely to incur lease expense of $20k to $50k per store. We believe that the $3.9m of total lease expense in the 2010 10K is, like much of the rest of the company's SEC filings, carefully crafted fiction.

### The Individual Defendants' False and Misleading Statements

40.     The 2007 10-K included the Company's audited financial statements for fiscal 2007. The 2007 10-K was signed by defendants Song, Chin, Du and Yick and separately certified by defendant Song and Company Chief Financial Officer ("CFO") Raymond Li pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the 2007 10-K. In the 2007 10-K the Company described its retail stores as follows:

We intend to expand the sale of our products to the other metropolitan cities in China through a combination of the traditional distribution channels and dedicated Shining stores. We opened our first store in Shanghai in March 2006, and plan to open additional Shining stores in Beijing, Shanghai, Jiangsu, Zhejiang, Shenyang, Harbin and Heilongjiang. We intend to open over 300 stores over the next two years. At the end of March 2007, we had opened a total of nine stores in Shanghai...

The 2007 10-K further described its financial information as follows:

Our probiotics products have generated strong sales and profit growth during the past two years, and have generated sufficient cash flow to finance our operations. Sales of our probiotics products increased 40% to $31 million in fiscal year 2007 from $22 million in fiscal year 2006. Similarly, income before taxes increased from $12.3 million in fiscal year 2006 to $15.1 million in fiscal year 2007.
...
Our net income was $ 10.90 million for the fiscal year ended March 31, 2007, which was 30.54 % above our net income of $ 8.35 million for the fiscal year ended March 31, 2006. Our growth in net income primarily resulted from growth in our sales volume of our products. Our average product prices did not change materially during fiscal year 2007. Shining Essence continued to be our best selling product, accounting for 61.57 %

of our sales revenue in fiscal year 2007 (68.27% in fiscal year 2006). The growth rate on this product's sales volume was 20 % in fiscal year 2007 (46%) in fiscal year 2006). Growth rates on our three other main products (Shining Signal, Shining Golden Shield and Shining Energy) ranged from 35 % to   65 %.

…

Gross profit increased by $6,282,071 from $15,417,237 for the 2006 fiscal year to $21,699,308 for the 2007 fiscal year. This represents a 40.7% increase, which reflects primarily increases in sales volume.

…

We had cash of $26.99 million and working capital of $21.23 million as of March 31, 2007, and cash of $19.84 million and working capital of $10.74 million as of March 31, 2006. Cash generated from operations was $10 million for the fiscal year ended March 31, 2007 and $6.98 million for the fiscal year ended March 31, 2006. Cash generated from operations for the fiscal year ended March 31, 2007 of $10 million was slightly lower than net income for the year of $10.89 million.

41.    The 2008 10-K included the Company's audited financial statements for fiscal 2008. The 2008 10-K was signed by defendants Song, Chin, Du and Yick and separately certified by defendant Song and Company CFO Raymond Li pursuant SOX attesting to the accuracy of the 2008 10-K. In the 2008 10-K the Company described its retail stores as follows:

We opened the first Shining retail store in Shanghai in March 2006. Over the following 12 months, we have opened a number of pilot stores in Shanghai to test run the retail sales operations and to build up our retail experience and expertise. We have also repackaged our products for sale in our stores, and have introduced several new products which are sold exclusively in our stores. As at March 31, 2008, we had a total of 60 Shining retail stores. 46 of these stores are located in Shanghai and the rest are located in 5 cities in China including Changchun and Jilin.

…

In preparation for the opening of additional retail stores, we have also been actively recruiting and training retail sales staff since the beginning of 2006. We have already successfully recruited a number of very experienced sales professionals and have trained a pool of sales staff. We have also designed and implemented control systems to manage this new business.

…

At March 2008, we had 60 Shining branded stores in Shanghai and 5 other major cities in China.

The 2008 10-K further described its financial information as follows:

Our probiotics products have generated strong sales and profit growth during the past two years, and have generated sufficient cash flow to finance our operations. Sales of our probiotics products increased 38% to $42.3 million in fiscal year 2008 from $30.6 million in fiscal year 2007. Similarly, income before taxes increased from $15.1 million in fiscal year 2007 to $22.5 million in fiscal year 2008. Excluding the $3.4 million gain arising from the revaluation of the conversion option embedded in the convertible notes issued in December 2007 included in other income, income before taxes increased by 26.6% from 2007 to 2008.

...

Our net income was $17.5 million for the fiscal year ended March 31, 2008. This included $3.4 million surplus arising from the revaluation of the conversion feature embedded in the convertible notes issued in December 2007 as required by FAS133. Excluding this revaluation surplus, our net income was $14.1 million, which was 29.9% above our net income of $10.9 million for the fiscal year ended March 31, 2007. Our growth in net income primarily resulted from growth in our sales volume of our products. Shining Essence continued to be our best selling product. We have enjoyed strong growth in demands for many products such as Shining Golden Shield and Shining Energy which outpaced that of Shining Essence. In addition, new product sales now account for 13.6% of our sales revenue during the year ended March 31, 2008 (1.9% in the year ended March 31, 2007). As a result, the percentage of sales revenue attributable to Shining Essence has been diluted to only 48% of our total sales revenue in the year ended March 31, 2008 (61% in the year ended March 31, 2007).

...

Gross profit increased by $8,311,711 from $21,699,308 for the 2007 fiscal year to $30,011,019 for the 2008 fiscal year. This represents a 38.3% increase, which reflects primarily increases in sales volume. Our gross profit margin remained the same as last year at 70.9%. In the fourth quarter of fiscal year 2008, the cost of packaging increased significantly due to increases in pulp and paper costs which reduced our gross profit margin for the fourth quarter to 66.6% from 73.3% in the third quarter.

...

We had cash of $64.31 million and working capital of $53.08 million as of March 31, 2008, and cash of $26.99 million and working capital of $21.23 million as of March 31, 2007. Cash generated from operations was $19.36 million for the fiscal year ended March 31, 2008 and $10.01 million for the fiscal year ended March 31, 2007.

42.     The 2009 10-K included the Company's audited financial statements for fiscal 2009. The 2009 10-K was signed by defendants Song, Chin, Du and Yick and separately certified by defendant Song and Company CFO Lewis Fan pursuant to SOX attesting to the accuracy of the 2009 10-K. In the 2009 10-K the Company described its retail stores as follows:

We opened the first Shining retail outlet in Shanghai in March 2006. We have also repackaged our products for sale in our outlets, and have introduced several new products which are sold exclusively in our outlets. As at March 31, 2009, we have opened 106 outlets in Shanghai and 12 other cities in China. In preparation for the opening of additional retail outlets, we have also been actively recruiting and training retail sales staff since the beginning of 2006. We have already successfully recruited a number of very experienced sales professionals and have trained a pool of sales staff. We have also designed and implemented control systems to manage this new business. Currently, we have a network of 106 outlets in China. We continue to survey cities in China to assess and select suitable locations for new outlets. As part of our strategy, we will also consider licensing franchisees to operate retail outlets in due course. We intend to finance the costs of our business expansion by our internal working capital.

The 2009 10-K further described its financial information as follows:

Our probiotics products have generated strong sales and profit growth during the past two years, and have generated sufficient cash flow to finance our operations. Sales of our probiotics products increased 28% to $54.2 in fiscal year 2009 from $42.3 million in fiscal year 2008 which was an 38% increase from $30.6 million in fiscal year 2007. Similarly, income before taxes increased from $15.1 million in fiscal year 2007 to $22.5 million in fiscal year 2008 to $25.1 million in fiscal year 2009. Excluding the $3.4 million gain in 2008 and the $3.1 million gain in 2009 arising from the revaluation of the conversion option embedded in the convertible notes issued in December 2007 included in other income, income before taxes increased by 15.2% from 2008 to 2009, and 26.5% from 2007 to 2008.

…

Our net income was $20 million for the fiscal year ended March 31, 2009. This included $3.1 million surplus arising from the revaluation of the conversion feature embedded in the convertible notes issued in December 2007 as required by FAS133. Excluding this revaluation surplus, our net income was $16.9 million, which was 19.9% above our net income of $14.1 million (excluded $3.4 million revaluation surplus) for the fiscal year ended March 31, 2008. Our growth in net income primarily resulted from growth in our sales volume of our products. Shining Essence continued to be our best selling product. We have enjoyed strong growth in demand for many products such as Shining Essence Stomach Protection and Shining Probiotics Protein Powder which outpaced that of Shining Essence. In addition, new product sales now account for 18.5% of our sales revenue during the year ended March 31, 2009 (15.6% in the year ended March 31, 2008). As a result, the percentage of sales revenue attributable to Shining Essence has been diluted to only 40% of our total

sales revenue in the year ended March 31, 2009 (49% in the year ended March 31, 2008).

…

Gross profit increased by $7,988,796 from $30,011,019 for the 2008 fiscal year to $37,999,815 for the 2009 fiscal year. This represents a 26.6% increase, which reflects primarily increases in sales volume. Our gross profit margin remained the same as last year at 70%.

…

We had cash of $70.8 million and working capital of $55.0 million as of March 31, 2009, and cash of $64.3 million and working capital of $53.1 million as of March 31, 2008. Cash generated from operations was $23.1 million for the fiscal year ended March 31, 2009 and $19.4 million for the fiscal year ended March 31, 2008.

43.     The 2010 10-K was signed by defendants Song, Chin, Du and Yick and separately certified by defendants Song and Company CFO Travis Cai pursuant to SOX attesting to the accuracy of the 2010 10-K. In the 2010 10-K the Company described its retail stores as follows:

We opened the first Shining retail outlet in Shanghai in March 2006. We have also repackaged our products for sale in our outlets, and have introduced several new products, which are sold exclusively in our outlets. As at March 31, 2010, we have opened 111 outlets in Shanghai and 12 other cities in China. In preparation for the opening of additional retail outlets, we have also been actively recruiting and training retail sales staff. We have already successfully recruited a number of very experienced sales professionals and have trained a pool of sales staff. We have also designed and implemented control systems to manage this new business. Currently, we have a network of 111 outlets in China. We continue to survey cities in China to assess and select suitable locations for new outlets. As part of our strategy, we will also consider licensing franchisees to operate retail outlets in due course. We intend to finance the costs of our business expansion by our internal working capital.

The 2010 10-K further described its financial information as follows:

Our probiotics products have generated strong sales and profit growth during the past two years, and have generated sufficient cash flow to finance our operations. Sales of our probiotics products increased 50% to $81.3 million in fiscal year 2010 from $54.2 million in fiscal year 2009, which was a 28% increase from $42.3 million in fiscal year 2008. Income before taxes increased from $22.5 million in fiscal year 2008 to $25.1 million in fiscal year 2009, and decreased to $23.4 million in fiscal year 2010.

…

Our net income was $15.6 million for the fiscal year ended March 31, 2010. This included a $12.1 million deficit arising from the revaluation of

the conversion feature embedded in the convertible note issued in December 2007 as required by FAS133 (now known as ASC 815). The convertible note will expire in December 2010, and will not have an impact on our net income after that date. Excluding this revaluation deficit, our net income was $27.7 million, which was 63.9% above our net income of $16.9 million (excluded $3.1 million revaluation surplus) for the fiscal year ended March 31, 2009. Our growth in net income primarily resulted from growth in our sales volume of in both our retail products and bulk additives products. Shining Essence continued to be our best selling retail product. We have enjoyed strong growth in demand for many products such as Shining Essence Stomach Protection and Shining Probiotics Protein Powder, which outpaced that of Shining Essence. In addition, bulk additives product sales now account for 26.8% of our sales revenue during the year ended March 31, 2010 (8.31% in the year ended March 31, 2009), the increase of which is a result of the rapid growth in shipments to dairy and animal feed customers.

…

Gross profit increased by $19,293,955 from $37,999,815 for the 2009 fiscal year to $57,293,770 for the 2010 fiscal year. This represents a 50.8% increase, which primarily reflects increases in overall sales volume. Our gross profit margin remained the same as last year at 70%.

…

We had cash of $155.6 million and working capital of $145.3 million as of March 31, 2010, and cash of $70.8 million and working capital of $55.0 million as of March 31, 2009. Cash generated from operations was $28.2 million for the fiscal year ended March 31, 2010, and $23.1 million for the fiscal year ended March 31, 2009.

44.     The foregoing statements were false and misleading because they are vastly inconsistent with the filings submitted to the SAIC, particularly with regard to the Company's revenues, cash and net income, and these discrepancies cannot be attributed to differences between U.S. and Chinese GAAP, nor to any other legitimate accounting matter. Further, the financial statements were false and misleading because the Company consistently and repeatedly misrepresented the size, scope, and growth of its purported network of stores and retail outlets in China.

## The Individual Defendants' Breaches of Fiduciary Duties

45.     The Company's pervasive financial reporting improprieties were the direct result of defendants Song, Chin, Du, and Yick's breaches of fiduciary duties.

46.     In breach of their fiduciary duties, defendants Song, Chin, Du, and Yick knowingly disseminated and filed with the SEC and SAIC inaccurate and inconsistent financial statements and other financial filings, as described above.

47.     In particular, defendants Song, Chin, Du, and Yick reported in the Company's SEC and SAIC filings drastically inconsistent financial results, particularly related to the Company's revenues and net income. The discrepancies cannot be attributed to differences between U.S. and Chinese GAAP, nor to any other legitimate accounting matter. The only explanation is that one or both sets of financial statements were materially inaccurate and misleading.

48.     Defendants Song, Chin, Du, and Yick, from 2007 to 2010, prepared and reviewed all financial statements of the Company, held committee meetings and met with management regularly regarding the Company's accounting practices and compliance with applicable regulations. As such, these defendants knew of the reporting problems but did nothing to rectify or prevent them. At a minimum, defendants Song, Chin, Du, and Yick knew that there were inexplicable discrepencies between the Company's SAIC and SEC filings and, therefore, that the SAIC-filed financial statements, SEC-filed financial statements, or both sets of financial statements, were materially inaccurate and misleading. Nevertheless, defendants Song, Chin, Du, and Yick made no effort to ensure that the Company corrected its financial statements or prevented future inaccurate and misleading filings.

49.     Defendants Song, Chin, Du, and Yick breached their fiduciary duties by knowingly employing improper reporting practices at the Company in violation of applicable U.S. and Chinese regulations and by knowingly disseminating inaccurate and inconsistent financial statements and financial filings resulting therefrom.

50.     As a direct and proximate result of defendants Song, Chin, Du, and Yick's breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with investigation of the misconduct.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

51.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties and other violations of law.

52.     Plaintiff is an owner of China-Biotics common stock and was an owner of China-Biotics common stock at all times relevant hereto.

53.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

54.     As a result of the facts set forth herein, Plaintiff has not made any demand on the China-Biotics Board to institute this action against Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

55.     The Board currently consists of four (4) directors: defendants Song, Chin, Du and Yick. Each of these directors is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, as follows:

a.      In light of their knowledge of and participation in the Company's ongoing improper reporting practices, as alleged in detail herein, defendants Song, Chin, Du and Yick each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

b.      Defendants Song, Chin, Du and Yick, as members of the Company's Board, all knowingly approved the filing of and signed inaccurate and inconsistent financial statements in violation of U.S. and Chinese reporting regulations, and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties.

c.      Defendants Chin, Du and Yick, as Audit Committee members, had the responsibility to, pursuant to the Audit Committee Charter:

i.      appoint, determine the funding for, and oversee the independent registered public accounting firm;

ii.     assist the Board in monitoring the integrity of the Company's financial statements and other SEC filings;

iii.     discuss with the management and the independent registered public accounting firm significant financial reporting issues and judgments and any major issues as to the adequacy of our internal controls;

iv.     review the annual and quarterly financial statements prior to their filing with the SEC and prior to the release of the results of operations;

v.     review the independence, performance and qualifications of the Company's independent registered public accounting firm and present its conclusions to the Board and approve, subject to permitted exceptions, any non-audit services proposed to be performed by the independent registered public accounting firm; and

vi.     assist the Board in its oversight responsibilities regarding the performance of the Company's internal audit function.

In performing their duties as Audit Committee members, these defendants knew that the Company's financial statements were inaccurate and misleading, yet they knowingly approved the filing and dissemination of the financial statements, and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties.

d.     The Individual Defendants' knowing participation in the improper reporting practices alleged herein is not, and could not possibly be, the result of an exercise of good faith business judgment. There is not, and could not possibly be, a good faith business reason to publish at least one, if not two, sets of materially inaccurate and misleading financial statements and to misrepresent the size, scope, and growth of Company's network of "stores" and "retail outlets."

## COUNT I
### Against the Individual Defendants
### for Breaches of Fiduciary Duties of Loyalty and Good Faith

56.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

57.     As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company

and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

58.     The Individual Defendants knowingly implemented and engaged in improper reporting practices at China-Biotics and knowingly filed inaccurate and inconsistent financial statements and other filings with the SEC and the SAIC, also attesting to their accuracy. Thus, they breached their fiduciary duties of loyalty and good faith.

59.     As a direct and proximate result of the Individual Defendants' foregoing breaches of their fiduciary obligations, the Company has sustained damages, as alleged herein.

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

DATED: November 18, 2010                    Respectfully submitted,

Mark Hanna
District of Columbia Bar No. 471960
Michelle L. Woolley
District of Columbia Bar No. 983455
MURPHY ANDERSON PLLC
1701 K Street, NW
Suite 210
Washington, DC 20006
Telephone: (202) 223-2620

Facsimile: (202) 223-8651
mhanna@murphypllc.com
mwoolley@murphypllc.com

*Attorneys for Plaintiff – Local Counsel*

Eric L. Zagar
Louis E. Moya
BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
lmoya@btkmc.com
ezagar@btkmc.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Jerry Marteney, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10-29-10_                      _Jerry Marteney_
                                      Jerry Marteney

## VERIFICATION

I, Jerry Marteney, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10-29-10_                              _Jerry Marteney_
                                                          Jerry Marteney